IN THE OREGON TAX COURT

MAYTAG CORPORATION,
a Delaware corporation

*v.*

DEPARTMENT OF REVENUE

(TC 3261)

Roy E. Crawford and Christine A. Deaton, Brobeck, Phleger & Harrison, San Francisco, California, represented plaintiff.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for defendant rendered August 26, 1993.

**CARL N. BYERS, Judge.**

Plaintiff is a large manufacturer doing business in several states, including Oregon. After an administrative hearing, defendant found two subsidiaries were part of plaintiff's unitary business. Defendant included the subsidiaries' incomes in apportioning plaintiff's income for corporate excise taxes and Multnomah County business income taxes for the years 1984 through 1987. Plaintiff timely appealed to this court, contending that the subsidiaries in question were separate and distinct businesses.

## FACTS

Prior to 1983, Magic Chef, Inc. (Magic Chef), was a Delaware corporation which manufactured and sold major home appliances, such as ranges, refrigerators and air-conditioners.

The home appliance business was divided among four divisions: Magic Chef, Admiral, Norge and Magic Chef Air-Conditioning. Dixie-Narco, Inc. (Dixie-Narco), a wholly owned subsidiary of Magic Chef, manufactured and sold soft drink vending and dispensing machines. In 1983, Magic Chef acquired Toastmaster, Inc. (Toastmaster), a manufacturer of small home appliances, such as toasters, frying pans, fans, clocks, etc. In 1985, Magic Chef acquired Ardac, Inc., (Ardac) which manufactured change machines for paper money. Magic Chef vertically integrated Ardac with Dixie-Narco so it could make money-changer machines for Dixie-Narco.[1] Early in 1986, Toastmaster was sold in a leveraged purchase. In May, 1986, plaintiff acquired Magic Chef by merger.

During the first year in question (1984) Magic Chef's four divisions were:

(1)   The Magic Chef Division, which had three plants manufacturing gas and electric ranges, microwave ovens and recreational vehicle ranges;

(2)   The Admiral Division, which had four locations and manufactured refrigerators, dehumidifiers and freezers;

---

[1] Plaintiff readily agrees the relationship between Ardac and Dixie-Narco is unitary.

(3)   The Norge Division, which had one location and manufactured washers and dryers; and

(4)   The Air-Conditioning Division, which had three locations and manufactured heating and air-conditioning equipment.

During the same year,[2] Toastmaster had seven locations, producing a wide variety of small home appliances. Dixie-Narco had one location, producing soft drink vending and dispensing machines.

Magic Chef had a small headquarters staff. The president and chief executive officer, S. B. Rymer, Jr., was the son of the founder of Magic Chef. Of the eight executive officers of the corporation, four officers headed divisions or subsidiaries. For example, Mr. Roy S. Steeley, was a vice president of Magic Chef, but his duties as vice president consisted of being president of Dixie-Narco. While officers like Mr. Steeley drew salaries only from their division or subsidiary, presumably the dual position afforded better coordination and control. After the merger with plaintiff, five additional officers of plaintiff also became officers of Dixie-Narco. In addition to the officers, Magic Chef maintained a small corporate staff estimated at between 10 to 12 people.

During the years in question, Magic Chef maintained a distribution center in Portland. The distribution and sale of appliances which took place in Oregon were part of Magic Chef's integrated business of manufacturing, distributing and selling appliances. Since only part of Magic Chef's activities took place in Oregon, its income must be apportioned for purposes of taxation. ORS 314.615.

## ISSUE

Were Dixie-Narco, Toastmaster and Ardac part of the Magic Chef and Maytag unitary business during the years in question? The disputed combinations for each year are:

| Tax Year Ended | Disputed Unitary Combination |
|---|---|
| 6/30/84 | Dixie-Narco and Toastmaster with Magic Chef |

---

[2] Although the court chose 1984 to discuss specific facts, the differences or changes in the later years do not affect the basic issue to be resolved.

| 6/30/85 | Dixie-Narco and Toastmaster with Magic Chef |
| 5/31/86 | Dixie-Narco with Magic Chef |
| 12/31/86 | Dixie-Narco and Ardac with Maytag |
| 12/31/87 | Dixie-Narco and Ardac with Maytag |

## THE LAW

In 1983, ORS 314.363(3) provided that affiliated corporations are part of a unitary group when they are "engaged in business activities which are integrated with, dependent upon or which contribute to the business activities of the group as a whole." OAR 150-314.363-(B) provided that "business activities of the group" had the same meaning as "trade or business" as used in OAR 150-314.615-(E). The latter rule listed three factors as good indicia of a single trade or business: (1) same type of business, (2) steps in a vertical process, and (3) strong centralized management. The rule states: "the presence of any of these factors creates a strong presumption that the activities of the taxpayer constitute a single trade or business." OAR 150-314.615-(E).

In June, 1983, the United States Supreme Court decided *Container Corp. v. Franchise Tax Board*, 463 US 159, 103 S Ct 2933, 77 L Ed 2d 545 (1983). In *Container Corp.*, the court upheld the constitutionality of worldwide apportionment of the taxpayer's income. The court held that application of the unitary business principle was proper and that the prerequisite to a constitutional finding of a unitary business is a "flow of value" not a "flow of goods." Apparently in response to that decision, in 1984, the Oregon Legislature met in special session and repealed ORS 314.363, adopting a new definition of a unitary group:

"(2)    'Unitary group' means a corporation or group of corporations engaged in business activities that constitute a single trade or business.

"(3)(a)    'Single trade or business' means a business enterprise in which there exists directly or indirectly between the members or parts of the enterprise a sharing or exchange of value as demonstrated by:

"(A)    Centralized management or a common executive force;

"(B)     Centralized administrative services or functions resulting in economies of scale; and

"(C)     Flow of goods, capital resources or services demonstrating functional integration.

"(b)     'Single trade or business' may include, but is not limited to, a business enterprise the activities of which:

"(A)     Are in the same general line of business (such as manufacturing, wholesaling or retailing); or

"(B)     Constitute steps in a vertically integrated process (such as the steps involved in the production of natural resources, which might include exploration, mining, refining and marketing).

"(c)     Whether two or more corporations that are included in the same federal consolidated return are engaged in a single trade or business may be determined by making reference to corporations that are doing business in the United States and are subject to federal income taxation, whether or not those corporations are includable in the consolidated return. No other corporations may be taken into consideration in making such a determination, except in a case in which the transactions or relationships between such corporations are made in an attempt to evade or avoid taxation." Or Laws 1984, ch 1, § 4 (codified as ORS 317.705 (1985 Replacement Part)).

■     It would appear that the Oregon statutes before and after *Container Corp.* intend to assert jurisdiction to the full extent allowed by the Due Process Clause. This is reinforced by the presumption of the administrative rule that a business is unitary from the mere presence of one of three factors.[3] Also the legislature's response to *Container Corp.* uses language which is broader than that found in *Container Corp.* Accordingly, the court finds the legislature intended to assert jurisdiction to tax to the full extent allowed by due process. As a result of this finding, the focus of this case is on the language of the Supreme Court decisions establishing the limits of the Due Process Clause.

---

[3] The court in *Container Corp.* found a similar presumption in the California law to be reasonable.

## THE UNITARY TEST

Before considering the specific facts, it is necessary to review briefly the legal principles which must be applied to those facts.

It has long been established that there must be a rational relationship between the taxing state and the business activities giving rise to the income which the state seeks to tax. The state must be able to show that it has given something for which it can ask a return. The concept of a unitary business makes the essential connection:

> "[T]he linchpin of apportionability in the field of State income taxation is the unitary business principle." *Mobil Oil Corp. v. Comm. of Taxes*, 445 US 425, 439, 100 S Ct 1223, 1232, 63 L Ed 2d 510, 522 (1980).[4]

If a subsidiary corporation is an integrated part of a business which is doing business within a state, the income of that subsidiary may be included in the measure of the income to be apportioned.

Determining whether a business is unitary is based on whether:

> " '[C]ontributions to the income [of the subsidiaries] result[ed] from functional integration, centralization of management and economies of scale.' " *F. W. Woolworth Co. v. Taxation & Rev. Dept.*, 458 US 354, 364, 102 S Ct 3128, 3135, 73 L Ed 2d 819, 827-28 (1982) quoting *Mobil*, 445 US at 438, 100 S Ct 1223, 63 L Ed 2d 510.

In a more recent case, the United States Supreme Court indicated:

> "The relevant unitary business inquiry * * * focuses on the objective characteristics of the asset's use and its relation to the taxpayer and its activities within the taxing State." *Allied Signal v. Director, Tax Div.*, ____ US ____, ____, 112 S Ct 2251, 2262, 119 L Ed 2d 533, 550 (1992).

---

[4] In *Mobil*, the court compared "a discreet business enterprise" which is not unitary, with "activities [that] are part of appellant's integrated petroleum enterprise" which the court treated as unitary. 445 US at 439, 100 S Ct at 1233, 63 L Ed 2d at 522.

This court must consider whether the facts in this case bring it within the tests set forth by the United States Supreme Court.

## CENTRALIZED MANAGEMENT

Plaintiff claims its very small staff provided little management services. Plaintiff claims no Magic Chef officers were involved in the day-to-day operations of either Dixie-Narco or Toastmaster. Magic Chef practiced management by objectives, giving its divisions and subsidiaries substantial freedom in their operations.

On the other hand, defendant sees plaintiff as providing strong centralized management. Plaintiff controlled capital expenditures, inventory levels, raises and incentive pay plans, logos and trademarks. Perhaps most important, plaintiff controlled the cash flow. Plaintiff daily swept cash from its divisions and subsidiaries into its banking system. Operating funds or capital expenditures required by the divisions or subsidiaries were controlled and advanced by plaintiff.

Plaintiff performed internal audits and required changes based on those audits. It set policies on financial accounting and reporting practices, pensions, insurance, employees' benefits and legal services. It provided policy for limited centralized purchasing for office equipment and rental cars.

■ The court finds that while plaintiff's management was not extensive day-to-day operation management, it was more than oversight of an investment. The control exercised by plaintiff was similar to that found by the state court and approved by the United States Supreme Court in *Container Corp.*, *see* 463 US at 177, 103 S Ct 2946, 77 L Ed 2d 561. Plaintiff did not treat Toastmaster or Dixie-Narco as investments. Rather, both were used as operating divisions similar to Norge and Admiral. While they made different products, their role and treatment by plaintiff was no different from plaintiff's other divisions.

## FUNCTIONAL INTEGRATION

The court finds that neither Toastmaster nor Dixie-Narco was functionally integrated with plaintiff's operations.

They made different products, and Dixie-Narco had a different customer base. There were no common manufacturing facilities, engineering functions or research and development activities. Plaintiff's distribution system and sales force were entirely separate from Toastmaster and Dixie-Narco. There was no commonality in repairs, parts, services or warranties. Any trading of technology which may have occurred was *de minimis*. Within the broad limits set by plaintiff, Dixie-Narco and Toastmaster could hire and fire their own employees, set salaries, vacations, retirement benefits and essentially operate as separate businesses. However, it appears all of plaintiff's divisions were given the same degree of discretion.

## ECONOMIES OF SCALE

Any economies of scale realized were primarily in administration rather than operation. Since Toastmaster and Dixie-Narco were not functionally integrated, there were no economies of scale realized from such practices as centralized purchasing or coordinated distribution and sales. Rather the benefits Dixie-Narco and Toastmaster realized were in lower overhead costs for such items as insurance, human resources, pension administration, rental cars, legal fees and internal audits. While plaintiff swept the subsidiaries' cash daily, Dixie-Narco and Toastmaster had financing available on an as-needed basis. In effect, Dixie-Narco and Toastmaster were just two of six divisions of Magic Chef. They were treated no differently than the other divisions with regard to budgeting. From Magic Chef's point of view, it benefited from the extraordinary cash flow produced by Dixie-Narco on a daily basis. Likewise, the diversified products and markets strengthened Magic Chef overall.

## CONCLUSION

This is a very close case. To meet the requirements of due process, there must be some connection between the activities of Dixie-Narco and Toastmaster, all of which took place outside Oregon, and the activities of Magic Chef, which took place in Oregon. Magic Chef's activities in Oregon consisted of a distribution warehouse in Portland and the sale of major appliances through that warehouse. Thus, the only connection Dixie-Narco and Toastmaster had with Magic Chef's activities in Oregon was their affiliation. That is,

Dixie-Narco and Toastmaster were treated as divisions and part of plaintiff's unitary business. While they may have manufactured different products for a different market, they were part of the integrated company as a whole and contributed to plaintiff in ways impossible to specifically identify or segregate. For example, Dixie-Narco's profitability undoubtedly brought value to plaintiff which enhanced plaintiff's ability to distribute and market major appliances in Oregon.

■ ■     The states are given wide latitude in their tax schemes to "approximate the in-state portion of value produced by a corporation's truly multistate activity." *See Allied Signal,* ___ US at ___, 112 S Ct at 2262, 119 L Ed 2d at 550. Here the focus is on whether the assets, Dixie-Narco and Toastmaster, serve an operational function rather than an investment function. Based upon the extent of the managerial control which plaintiff exercised over Dixie-Narco and Toastmaster, the court finds that they served an operational function. Plaintiff does not treat Dixie-Narco or Toastmaster as investments. Rather, plaintiff controlled their operations in the same manner as its divisions. Consequently, the activities of those businesses, which give rise to the income earned by Dixie-Narco and Toastmaster, are not unrelated to plaintiff's activities in Oregon. The court finds defendant's Opinion and Order No. 91-0270 must be sustained. Defendant to recover costs.