Plaintiff appealed Oregon corporate excise tax assessments for the taxable years 1997, 1998, 1999, and 2000. The Notices of Tax Assessment assert tax deficiencies of $454, $10,201, $131,430, and $207,278, respectively, plus statutory interest. The parties submitted stipulated facts and joint exhibits in September 2004. An evidentiary hearing was held in November 2004, followed by the submission of sequential briefs. The record was closed in April 2005.
Plaintiff was represented by R. Dale Eggleston, Vice President of Taxes, Schuler Homes; James K. Schuler (Schuler) testified at the evidentiary hearing. Defendant was represented by Marilyn J. Harbur, Assistant Attorney General. Plaintiff is referred to variously throughout this Decision as either Plaintiff or Schuler Homes Oregon.
The issue presented is whether Schuler Homes Oregon was part of a unitary group consisting of Schuler Homes, Inc., the parent corporation in Hawaii (hereinafter Schuler Homes or the parent), and its various divisions and subsidiaries, which together operated in seven geographic areas as the Schuler Homes Group. Plaintiff agrees that Schuler Homes Oregon and Schuler Homes of Washington, Inc. (Schuler Homes Washington), which were managed at all times by the same management team, were unitary with one another, but disagrees that those two entities were unitary with the rest of the Schuler Homes Group.
 I. STATEMENT OF FACTS
Plaintiff was a division of the Schuler Homes Group, a large scale developer of residential housing headquartered in Honolulu, Hawaii, and operating in six states.[1] Schuler, a *Page 155 
builder and developer with more than 30 years of home-building experience, started the company in March 1988. Schuler Homes went public on March 20, 1992, to raise capital. Schuler testified that the initial public offering raised $80 million.
The seven geographic markets in which the Schuler Homes Group did business were Hawaii, Northern California, the Portland, Oregon/Vancouver, Washington metropolitan area, Colorado, the Puget Sound metropolitan area of Washington, Southern California, and Arizona. Each geographic market operated as a "division." The divisions were headed by a president. Four of the seven divisions operated under the Schuler Homes name, the exceptions being Stafford Homes in the Puget Sound area, Rielly Homes in Southern California, and the Melody Group in Colorado. Those three companies were acquisitions. The startups were all formed under the Schuler name, and operations in Arizona, although begun through the acquisition of Rielly Homes, took on the Schuler name. According to the stipulated facts, "[s]eparate legal entities were used for the operations of each of the geographic markets, with the `Hawaii Division' being a legal division of the parent company, Schuler Homes. Schuler Homes Oregon and Schuler Homes Washington made up what was called the `Oregon Division' or `Northwest Division.'"
Schuler Homes was a family owned and operated business, built and run by Schuler. For all years at issue, Schuler owned in excess of 50 percent of the outstanding stock of Schuler Homes. Schuler served as President and Chief Executive Officer of Schuler Homes and was also Chairman of the Board of Directors. Schuler's father was a vice president before his death. Schuler's daughter, Pamela S. Jones (Pamela), and son-in-law, Michael T. Jones (Michael), also served as officers and directors of Schuler Homes. Pamela was its Senior Vice President of Finance and Chief Financial Officer (CFO), and Michael was Executive Vice President of Operations. According to the stipulated facts, Schuler, his daughter, and son-in-law "were officers of all of the subsidiaries, including Schuler Homes of Oregon, but were not their sole officers." Moreover, "[a]ll three served *Page 156 
as the sole directors of all of the subsidiary corporations of Schuler Homes, including Schuler Homes Oregon."
"In the mid-1990s, Hawaii's economy stagnated[,] causing a slowdown in Hawaii's residential real estate market. To improve operating results and returns on capital, Schuler Homes implemented a strategic plan to redeploy capital from its Hawaii operations * * * to several high growth markets in the mainland United States." Schuler testified that "we identified markets we wanted to build in," markets "closest to Hawaii," and in Washington because of friends and family there. Expansion began in 1996 with the formation of divisions in Northern California, Southern Washington, and Oregon. The divisions operated as Schuler Homes of California, Inc. (Schuler Homes California), Schuler Homes of Oregon, Inc. (Plaintiff), and Schuler Homes of Washington, Inc. (Schuler Homes Washington). Each division was a wholly owned subsidiary of Schuler Homes and thus part of the emerging Schuler Homes Group. Separate subsidiary corporations were formed in each state because of different licensing and regulatory requirements. For the year that ended December 31, 1996, the three new start-ups "had no revenues and no assets * * * and [were] used to implement Schuler Homes' strategic plan."
Expansion continued in January 1997, with the acquisition by Schuler Homes of Melody Homes, a 45-year old homebuilding company in the Denver metropolitan area, and Melody Mortgage Co. Later that year, "[i]n July 1997, Schuler Homes formed a subsidiary named SHLR of Washington, Inc., which acquired a 49% partnership interest in the capital and profits of Stafford Homes, a homebuilder for over 30 years in the Greater Puget Sound area of the state of Washington." Roughly one year later, "[i]n October 1998, Schuler Homes Oregon acquired certain assets of Keys Homes, Inc., a Portland homebuilder. In January 1999, SHLR * * * increased its ownership interest in Stafford [Homes] to 89%." For purposes of this Decision, final expansion occurred in July 1999, with the acquisition by Schuler Homes of Rielly Homes, Inc. (Rielly Homes). Rielly Homes *Page 157 
was an existing homebuilder in Southern California and Arizona with 13 years prior experience.[2]
Each of the divisions of the Schuler Homes Group operated on a large scale, building homes in subdivisions ranging in size from 50 to 500 units.
 "Development projects on mainland United States typically took one to four years to develop, depending on the project's size, the company's strategy with respect to the particular project, regulatory approvals, [and] environmental impact analysis * * *. Larger projects would be divided into phases, with each phase generally taking six months to one year to complete."
The nature of the homebuilding business is such that "successful real estate development [is] highly dependent on people with local homebuilding expertise." For that reason, management of day-to-day operations was overseen by division managers, titled presidents. "Management in charge of the various geographic markets in which the Schuler Homes Group operated had a significant number of years of experience in the homebuilding industry, with in-depth familiarity with the markets in which they operated." In the case of the four acquisitions, existing and experienced management personnel stayed in their positions for the Schuler Homes Group after the acquisition.[3] Experienced managers were hired by Schuler to manage the newly formed entities in Northern California and Oregon/Washington. Management typically did not transfer between the divisions. However, there was a period of roughly six weeks when Harvey Goth (Goth), Senior Vice President of Acquisition and *Page 158 
Development for Schuler Homes in Hawaii, managed the Portland office after the termination of the prior manager, Alan West, in mid-December 1997. Michael McKissick (McKissick), a builder with 20 years experience, who was hired by Schuler to head the Schuler Homes California management team, took over for Goth, and split his time between California and Oregon operations for the next eight months, until a suitable replacement for West could be found. When Schuler Homes acquired Keys Homes in October 1998, Sean Keys and the management team of Keys Homes assumed responsibility for management of Schuler Homes Oregon and Schuler Homes Washington (the Portland office).
Although there was some independence within each division in terms of day-to-day operations, there was considerable corporate oversight as well. The various divisions "submitted business plans each year to Schuler Homes" that were reviewed "with respect to profitability issues and investment concerns." After the plan was approved by the parent, it was "monitored" through a combination of corporate review of ongoing financial and activity reports, and monthly meetings. The divisions also submitted weekly financial and activity reports, and "Jim Schuler or Harvey Goth * * * generally met with top management of the divisions/subsidiaries on a monthly basis. The purpose of these monthly meetings was to monitor the divisions/subsidiaries against their business plans regarding items of budget and profitability." Schuler typically conducted those meetings, flying from Hawaii to the mainland each month to the states in which the various divisions operated. Schuler testified that there was also an annual meeting in Hawaii attended by the division presidents.
The homes that were built by each of the divisions within the Schuler Homes Group were constructed using standardized design plans that were created and maintained by and for the particular division. The parties agree that "[d]esign plans were available to share amongst Schuler Homes Group divisions/subsidiaries operating in different geographic markets, but were little used because each entity's product had to be geared to its unique market." Plaintiff acknowledges that on one occasion it did use a design plan acquired from another division, although modifications had *Page 159 
to be made to comply with the zoning requirements and market conditions. "None of the Portland office design plans were used by the other divisions/subsidiaries in the Schuler Homes Group."
The various divisions within the Schuler Homes Group "used somewhat different marketing names and logos to identify themselves, and to establish brand name recognition in their local geographic areas." However, Schuler Homes, Inc. Hawaii (the parent), Schuler Homes Arizona, and Schuler Homes California (Northern) used the same logo. The Schuler name appeared in the title of four of the seven divisions, including Plaintiffs — Schuler Homes Oregon, which was marketed as Keys Schuler Homes Oregon after the acquisition of Keys Homes by the parent Schuler Homes in October 1998.
As for administrative services, the parties have stipulated that "[a]ccounting, construction, human resources, information technology, legal, purchasing, sales and marketing, and warranty functions were performed by each division/ subsidiary with respect to its geographic area. These functions were not performed for the divisions/subsidiaries at the parent company level." Moreover, most of the divisions used different computerized software programs "to perform job cost, production and sales, purchasing, warranty, accounts payable and general ledger functions." The Portland office (Schuler Homes Washington and Schuler Homes Oregon) did use the same software system as SHLR, which operated as a separate division in the Puget Sound area of Washington.
It appears that there were 14 or more employees working for Schuler Homes in Hawaii overseeing the Schuler Homes Group. There were seven to nine officers plus a staff of seven professional and support personnel. According to the stipulated facts, "Schuler Homes maintained a small staff (5 professionals and 2 secretaries) that functioned as a corporate reporting unit on behalf of the Schuler Homes Group, gathering data from the divisions/subsidiaries, for consolidated accounting, tax, and SEC requirements." Plaintiff and the other divisions reimbursed the parent for those services. Otherwise, Plaintiff and the other divisions did not pay Schuler Homes any fees for "overhead, corporate governance *Page 160 
or corporate management." Schuler Homes filed consolidated federal income tax returns that included the income and expenses of the subsidiaries. Financial statements, such as annual reports, were reported on a consolidated basis, addressing all divisions/subsidiaries.
Schuler Homes obtained "suggested insurance requirements" regarding subcontractor liability insurance from a company in Hawaii, and disseminated those guidelines to the various "divisions/subsidiaries for utilization by them in negotiating their contractor agreements." The Employee Handbooks issued by the divisions/subsidiaries to their employees, "[although not identical, * * * were very similar in style and content." In addition, "[b]oard activities of the subsidiaries were performed via written consent of their directors * * *[and] [t]he written consents * * * were maintained at Schuler Homes [in Hawaii]."
The parties agree that
 "[t]he divisions/subsidiaries had their own purchasing departments * * * responsible for land acquisitions, and labor and material purchases, but they were subject to an approval process by Schuler Homes for land purchases. * * * All land purchases by any member of the Schuler Homes Group were required to be submitted to and initially approved by Schuler Homes' Land Purchase Committee[,] * * * comprised of Jim Schuler, Pam Jones and Harvey Goth. All land purchases were required to meet the guidelines [established by one of two corporate officers in Hawaii]."
Schuler testified that nobody could buy land without his approval. Schuler explained that the bank that provided the financing required his approval. However, he further testified that "we" wanted to ensure that the land purchased "made good sense." According to the stipulated facts, "[t]he Land Purchase Committee also had to review and approve a detailed project budget and cash flow and revised business plan to reflect the new project." Schuler testified that the division president first determined the viability of the land purchase, after which he (Schuler) would fly over and look at the land, and go over the various aspects of due diligence with the local manager. "If I approved it, I funded it." The business plans included the type and size of homes to be *Page 161 
built. Schuler testified that he reviewed the plan before he ever looked at the proposed land purchase, and acknowledged that his approval encompassed the entire project, not just the land.
According to the stipulated facts, "[t]he Schuler Homes Group maintained one central bank account and line of credit for all of the group." That account was in Hawaii. Land purchases were funded from the line of credit extended by the central bank. Schuler testified that he and his daughter negotiated the terms of the loans with the bank. And, although each division had its own separate bank account, "* * * the divisions/subsidiaries were instructed by Schuler Homes' accounting department to have their escrow company directly wire sales proceeds after a sale closed to the central bank account * * *." Each of the divisions was indebted to Schuler Homes for millions of dollars for each of the years at issue. The indebtedness "represented amounts that were borrowed or withdrawn from the central bank account in excess of deposits made to the central bank account by the subsidiary." Schuler Homes did not impose interest or other charges on the divisions for their account balances (of course, the central bank did impose interest on outstanding loan balances). Schuler's longstanding relationship with the bank enabled the company to expand. Schuler testified he had the contacts and relationships with the bank; that he had done business with the bank since the 1970s and had been a good customer; "when we expanded the company, and when we went public, we maintained our relationship with that bank, and they continued to fulfill all our capital requirements."
"Schuler Homes approved promotions, salary increases, and bonuses for its [division] presidents and officers[,]" but not for the other employees. Schuler Homes offered a company-wide retirement plan "that covered substantially all employees." The plan was administered centrally, with the assistance of a third-party administrator appointed by Schuler Homes. The company also had a stock option plan available to key employees.
The parties agree that "Schuler Homes required the purchase of capital items (single purchases in excess of *Page 162 
$10,000 and cumulative purchases in any one year in excess of $50,000) to be approved by the corporate office. Capital expenditures requiring corporate approval were approved by Pam Jones and Jim Schuler." There is some disagreement as to when the requirement of corporate office approval took effect. The stipulated facts are silent on that question, and a memorandum on the subject is equivocal.[4] Schuler testified that the policy did not take effect until April 2000. The court accepts Schuler's testimony that the policy requiring such approval did not take effect until April 2000. Additionally, it appears that the company had existing guidelines for computer hardware and software purchases that applied to all of the divisions/subsidiaries. The April 2000 memorandum from Schuler to the division presidents discussed immediately above, which sets forth the approval requirement for capital expenditures, also provides: "Technological advances come extremely rapid these days. Although we have written company standards and specifications for computer hardware and software (see attached), these can quickly be out of date." (Emphasis added.)
 II. ANALYSIS
A. Overview of the Law
 1, 2. Oregon employs the "unitary business" principle and formula apportionment in applying its income-based corporate excise tax. Formula apportionment: *Page 163 
 "rejects geographical or transactional accounting, and instead calculates the local tax base by first defining the scope of the `unitary business' of which the taxed enterprise's activities in the taxing jurisdiction form one part, and then apportioning the total income of that `unitary business' between the taxing jurisdiction and the rest of the world on the basis of a formula taking into account objective measures of the corporation's activities within and without the jurisdiction."
Container Corp. v. Franchise Tax Bd., 463 US 159, 165,103 S Ct 2933, 77 L Ed 2d 545 (1983) (Container Corp.).
Plaintiff is subject to Oregon's formula apportionment if it operated as part of a unitary group with some or all of the out-of-state entities comprising the Schuler Homes Group.
3. A unitary business is "a corporation or group of corporations engaged in business activities that constitute a single trade or business." ORS 317.705(2).[5] A" `single trade or business' may include, but is not limited to, a business enterprise the activities of which [a]re in the same general line of business (such as manufacturing, wholesaling or retailing)[.]" ORS 317.705(3b). Although paragraph (3)(b) falls short of establishing a presumption that corporations engaged in the same line of business are unitary, the Supreme Court found such an administrative presumption would be "reasonable," stating that:
 "[w]hen a corporation invests in a subsidiary that engages in the same line of work as itself, it becomes much more likely that one function of the investment is to make better use — either through economies of scale or through operational integration or sharing of expertise — of the parent's existing business-related resources."
Container Corp., 463 US at 178.
4. The distinguishing element of a unitary business is "a sharing or exchange of value" between the members or parts of the enterprise demonstrated by: *Page 164 
 "(A) [c]entralized management or a common executive force;
 "(B) [c]entralized administrative services or functions resulting in economies of scale; and
 "(C) [f]low of goods, capital resources or services demonstrating functional integration."
ORS 317.705(3). Under the applicable administrative rule, all three factors must be present. See OAR 150-317.705(3) (a)(2).
Plaintiff filed corporate excise tax returns with Defendant for the years at issue on a separate accounting basis. Plaintiff now acknowledges that it was part of a smaller unitary group consisting of itself and Schuler Homes Washington, but insists it was not unitary with the other divisions/subsidiaries comprising the Schuler Homes Group. Defendant argues that "Schuler Homes operated as the quintessential unitary business with its single line of residential homebuilding business, managed by James Schuler and a few other individuals."
B. Centralized Management or Common Executive Force
Plaintiff contends that there was an insufficient degree of centralized management or common executive force to support a unitary relationship, insisting that each division operated as a discrete business enterprise. Plaintiff analogizes the operation of the Schuler Homes Group to the facts in F.W. WoolworthCo. v. Taxation Revenue Dept., 458 US 354,102 S Ct 3128, 73 L Ed 2d 819 (1982) (Woolworth), andNabisco Brands, Inc. and Affiliates v. Dept. of Rev., TC-MD 010109A, WL 21246425 (Apr 3, 2003) (Nabisco).[6] Plaintiff insists that the division presidents "made all decisions affecting their business units other than obtaining the source of financing for them," that they "were responsible for developing their business plans and the execution of them[,]" and were generally "responsible for the day to day operations of their business." Additionally, Plaintiff notes that the *Page 165 
division managers had significant experience, and did not transfer between divisions. The court has a different view of the situation.
5. The Schuler Homes Group had a common executive force overseeing the operations of the parent and all of the subsidiaries. Schuler, his daughter, and son-in-law were officers of the parent and all of the divisions/subsidiaries, and served as the sole directors of all of the divisions/subsidiaries. Plaintiff and the other divisions submitted annual business plans to the parent (Schuler Homes) for initial approval and ongoing review and monitoring. Plaintiff concedes that point in its brief. Ongoing activities were monitored by the submission of weekly financial and activity reports, another point conceded by Plaintiff in its brief. Neither Plaintiff nor any of the other divisions could purchase land without the approval of the "Land Purchase Committee," comprised of Schuler, his daughter Pamela, and Harvey Goth, all of whom were corporate officers working in Hawaii. Guidelines for all land purchases were established by one of two corporate officers in Hawaii. Those guidelines governed all land purchases.
Schuler, who was Chairman, President and CEO of Plaintiff and the parent (Schuler Homes) in Hawaii, as well as President and CEO of all of the divisions/subsidiaries, was integrally involved in the operations of each of the divisions/ subsidiaries. As part of the approval process for the purchase of land, Schuler would meet with the division president and personally view the property under consideration. Schuler testified that nobody could purchase land without his approval. On the witness stand, Schuler demonstrated considerable knowledge of several different local Oregon real estate markets, referencing different towns and area amenities, and discussed the process he would undertake to help determine the types of homes to be built in a given subdivision. The business plans outlining the proposed development included information as to the type and size of the homes to be built.
More importantly, although there were weekly, monthly, and annual reports submitted by the divisions to the corporate office in Hawaii, Schuler apparently felt it *Page 166 
necessary to meet monthly with all of the division presidents. Schuler flew to the mainland from Hawaii every four to six weeks to hold day-long meetings with the division presidents in the various local division offices. The purpose of those meetings, according to the stipulated facts, "was to monitor the divisions/subsidiaries against their business plans * * *." Schuler Homes also held an annual business meeting in Hawaii that was attended by all of the division presidents. Additionally, Schuler Homes approved promotions, salary increases, and bonuses for its division presidents and officers. Beginning in April 2000, Schuler Homes began requiring the purchase of large capital items to be approved by the corporate office, and specifically by either Schuler or his daughter.
6. It is true that day-to-day management was left to the division presidents, but as the Supreme Court stated inContainer Corp., "* * * Exxon illustrates * * * [that] mere decentralization of day-to-day management responsibility and accountability cannot defeat a unitary business finding. * * * The difference lies in whether the management role that the parent does play is grounded in its own operational expertise and its overall operational strategy."463 US at 180 n 19 (internal citation omitted). In this case, the court is left with the distinct impression that local management operated within the guidelines established by the parent corporation and was subject to ongoing monitoring by Schuler and a few others in Hawaii. In that regard, management was much less decentralized than was true of the taxpayer inWoolworth, and Plaintiff's reliance on theWoolworth decision is misplaced.
Woolworth owned a majority interest in four foreign subsidiaries; three were wholly owned subsidiaries. See Woolworth,458 US at 356. That ownership interest enabled Woolworth to elect all of the subsidiaries' directors, and therefore gave Woolworth the ability — the potential — to control the subsidiaries. Id. at 362. As Plaintiff notes, the court ruled that "the potential to operate a company as part of a unitary business is not dispositive when, looking at the underlying economic realities of a unitary business, the dividend income from the subsidiaries in fact is derive[d] from *Page 167 
unrelated business activity which constitutes a discrete business enterprise." Id. (internal quotation marks omitted; emphasis in original).
In finding that "each subsidiary operated as a distinct business enterprise," the court noted that "[w]ith one possible exception, none of the subsidiaries' officers * * * was a current or former employee of the parent." Id. at 366. In this case, there are many common officers and directors. Whereas the testimony in Woolworth was that "[e]ach of the four subsidiaries [was] responsible for determining the size and location of retail stores, the market conditions in their own territory and the mix of items to be sold," id. at 367, here, Schuler and other officers in Hawaii serving on the land purchase committee ultimately decided where a subdivision would be located and the types of homes to be built therein. Finally, the court found it important that "* * * Woolworth had `no department or section, as such, devoted to overseeing the foreign subsidiary operations.'" Id. That was simply not the case with Schuler Homes, where Schuler and other officers in Hawaii clearly devoted themselves to overseeing division operations stateside. And, unlike Woolworth, the parent and the divisions/subsidiaries constituting the Schuler Homes Group did consolidate federal tax returns. See id.
at 367-68.
The facts in this case, as they pertain to management, are more analogous to Maytag Corp. v. Dept. of Rev., 12 OTR 502
(1993) (Maytag), than Woolworth. Taxpayer inMaytag "practiced management by objectives, giving its divisions and subsidiaries substantial freedom in their operations." Id. at 508. Maytag "performed internal audits and required changes based on those audits. It set policies on financial accounting and reporting practices, pensions, insurance, employees' benefits and legal services."Id. Schuler and the other officers in Hawaii exercised as much if not more control over Plaintiff and the other divisions comprising the Schuler Homes Group. Accordingly, the court concludes that Plaintiff and the other divisions comprising the Schuler Homes Group operated under centralized management with a common executive force as provided in ORS317.705(3)(a)(A). *Page 168 
C. Economies of Scale
The second statutory requirement for the finding of a "single trade or business" is the existence of "[c]entralized administrative services or functions resulting in economies of scale[.]" ORS 317.705(3)(a)(B). Although it is quite clear that Schuler Homes had centralized management and a common executive force overseeing the operations of the various divisions, the question of economies of scale through centralized administrative services or functions is more difficult. The parties have stipulated that "[a]ccounting, construction, human resources, information technology, legal, purchasing, sales and marketing, and warranty functions were performed by each division/subsidiary * * * [and that] [t]hese functions were not performed * * * at the parent company level." And, most of the divisions used different computerized software programs. Plaintiff argues that those factors demonstrate that "[c]entralized administrative services or functions resulting in economies of scale did not exist * * * to a degree sufficient to support a unitary relationship." The court disagrees with that conclusion.
7. Schuler Homes had a centrally administered, company-wide retirement plan covering virtually all employees, including those employed by Plaintiff. The company also offered health insurance and had a stock option plan available to key employees. The divisions informed Schuler Homes of their financial needs and funding was made available by Schuler Homes via the central bank in Hawaii. Schuler and his daughter negotiated the terms of the loans used to finance division operations. They dealt with lending institutions in Hawaii with which they had long-standing relationships. That effort freed the division managers from the time and expense involved in negotiating for financing. Additionally, the existence of a central bank account, with a central line of credit, likely afforded a lower interest rate and a greater amount of credit than existing home builders Melody Homes and Stafford Homes were able to find on their own. See Lee v. Dept. of Rev.,14 OTR 460, 463 (1998) (concluding that "[although not expressly stated, the centralized or single-capital pool would allow a division to bid on jobs not otherwise attainable"). *Page 169 
Moreover, Schuler Homes provided detailed suggested subcontractor insurance requirements to Plaintiff and the other divisions to utilize, and the various divisions used essentially the same employee handbook, which was developed by Schuler Homes in Hawaii. All land purchases were subject to guidelines developed by corporate officers in Hawaii. Those guidelines were comprehensive and incorporated the various aspects of due diligence, and were intended to avoid mistakes and maximize profits. As such, those guidelines were integral to the corporate business model followed by each of the divisions.
In addition, as Defendant has noted, Schuler's expertise and oversight contributed to the success of the various divisions.
 "James Schuler used his technical expertise to select managers, titled presidents, for each geographical division, * * * [b]ut, in contrast with a passive investor, James Schuler regularly met with the presidents, reviewed regular sales and closing reports, flew to inspect and approve all land acquisitions, and provided other technical assistance in the process of reviewing and approving the divisions' business plans."
Finally, although the parties have stipulated that accounting was performed by the divisions, Schuler Homes had a staff of seven employees in Hawaii that functioned as the corporate reporting unit for the Schuler Homes Group, "gathering data from the divisions/subsidiaries, for consolidated accounting, tax, and SEC requirements." Those individuals prepared and filed consolidated federal tax returns and annual business reports, presumably with the oversight and assistance of the seven to nine corporate officers in Hawaii, who held titles such as Senior Vice President of Finance and Chief Financial Officer (Pamela), Vice President of Finance and CAO[7] (Doug Tonokawa), Vice President of Acquisition (Harvey Goth), Vice President of Design and Land Development (Peter Aiello), and Vice President of Sales and Marketing (Mary Flood). In that regard, this case is distinguishable from Woolworth, where there was no central tax *Page 170 
department and the parent and subsidiaries did not consolidate tax returns. 458 US at 367-68, 369 n 22.
Moreover, in Woolworth, the "parent did not provide many essential corporate services for the subsidiaries, * * * there was no centralized purchasing office[,] * * * sales were [not] facilitated through the use of a uniform credit card system, uniform packaging, brand names, and promotional displays, all run from the national headquarters." Id.
at 370 (internal quotation marks and citations omitted). By contrast, Schuler Homes provided considerable corporate services to the subsidiaries. As stated above, it had centrally administered retirement, health insurance, and stock option plans, centralized financing, guidelines for land purchases and subcontractor insurance requirements, a common employee handbook, and a centralized staff that prepared and filed consolidated federal tax returns and annual business reports. The centralized administrative services result in economies of scale, satisfying the second requirement for the finding of a single trade or business. See ORS 317.705(3)(a)(B).
D. Functional Integration
The third and final factor required for a finding that taxpayer is a single trade or business is the "[f]low of goods, capital resources or services demonstrating functional integration." ORS317.705(3)(a)(C).
8. In the case at hand, functional integration is exhibited primarily through planning approval and financial control. Plaintiff identified land it proposed to purchase based on corporate guidelines. It could not make a purchase without the review and approval of the Land Purchase Committee, composed of officers in Hawaii, including Schuler. Schuler personally inspected the proposed purchase as part of his approval process. According to the testimony, Schuler lent his expertise to the determination of the types of homes to be built in a given subdivision. Plaintiff's operations, and those of the other divisions, were monitored by Schuler and other officers in Hawaii. There were weekly and monthly reports sent to Hawaii by all of the divisions, and Schuler flew to Oregon (and the other division locations) monthly to meet *Page 171 
with the president. Schuler testified that he visited each division every four to six weeks and "sat down with the manager." In addition to those monthly meetings, Schuler hosted an annual meeting in Hawaii with the division managers to discuss business operations. One purpose for that meeting was to allow top management of the various divisions to have interaction with each other because, as Schuler testified, they all worked for the same company. And, although the parties stipulated that each division had its own legal representation, Schuler testified that "we" have an attorney in every state. When pressed on cross-examination as to the reference to "we," Schuler testified that it referred to himself and his daughter.
Financing came from the central bank in Hawaii, the terms of which were negotiated by Schuler and his daughter. Plaintiff acknowledges that Schuler Homes provided all financing for its divisions/subsidiaries. Schuler testified that Plaintiff and the other divisions were prohibited from independently obtaining financing — as Schuler put it, they were subsidiaries and could not commit the parent. Pursuant to instructions from the accounting department in Hawaii, proceeds from the sale of homes were wired by the various escrow companies in the different states on the mainland directly to the central bank in Hawaii without ever passing through the local banks used by Plaintiff and the other divisions. Those divisions, in turn, "kept Schuler Homes informed of their cash needs, which allowed Schuler Homes to administer the credit facility for the Schuler Homes Group."
The extent of Plaintiffs financial oversight is even more complete than the daily cash sweeps that marked the plaintiffs operation in Maytag, and distinguishes this case fromWoolworth, where the subsidiaries were responsible for obtaining their own financing from sources other than the parent. In Container Corp., the appellant played a "substantial role * * * in loaning funds to the subsidiaries and guaranteeing loans provided by others," and the Court observed that "[t]here is no indication that any of these capital transactions were conducted at arm's-length, and the resulting flow of value is obvious." 463 US at 179, 180 n 19. The same *Page 172 
situation exists in the instant appeal, with the parent controlling all aspects of the financial picture for the entire Schuler Homes Group and making the money available to the divisions without additional charge. The lending institution in Hawaii apparently viewed Schuler Homes as a functionally integrated organization; Schuler testified that the bank was concerned with risk and therefore limited the amount of money Schuler Homes could invest in a certain area until it
became more experienced in that area. The "it" was Schuler Homes and the lender was reluctant to lend too much money to Schuler's activities in a new region until it acquired sufficient expertise.
9. Some degree of functional integration is evidenced by the application of policies and procedures on a company-wide basis. The "Introduction" to the handbook for Schuler Homes Oregon states that the handbook "describes some of the Company's employment policies and procedures which applies [sic]
to all of its subsidiaries and divisions." Company-wide health insurance was offered, as were flexible spending accounts for employees to use pretax income to pay for dependent care expenses and medical insurance, etc. Another benefit available to eligible employees was the discounted purchase of company stock through periodic payroll deductions. Beginning in calendar year 2000, the purchase of capital items required corporate approval "primarily for the purpose of trying to maintain consistency and compatibility among the Divisions with respect to computer hardware and software." Schuler testified that the company was considering whether or not to implement a company-wide computer system.
Unlike Woolworth, where the subsidiaries autonomously and independently performed the functions of "seeing to the merchandise, [store] site selection, advertising and accounting control[,]" 458 US at 365, Plaintiffs decisions as to the location of a subdivision and the types of homes to be built therein were informed and guided by Schuler, and approved by the Land Purchase Committee in Hawaii. And, although they were little used, home design plans were available to share amongst the Schuler Homes Group divisions, a practice that simply would not occur between separate homebuilding companies. The policy of making the plans *Page 173 
available to other divisions suggests a functionally integrated organization. The provision by the corporate office of suggested subcontractor insurance guidelines lends further support for the conclusion that Plaintiff was functionally integrated with the other divisions. The same is true of the "written company standards and specifications for computer hardware and software." Moreover, Schuler Homes and two of its divisions used the same company logo and the Schuler name appeared in the title of four of the seven divisions, including Plaintiff.
Plaintiff argues that each division had its own management, that there was no transfer of executives between divisions, that slightly different products (i.e., homes) were developed for the different markets in which the Schuler Homes Group operated, that the divisions had their own purchasing departments, provided their own advertising, had their own separate website page and address that was designed, produced, and maintained locally, and that the divisions used somewhat different marketing names and logos. Plaintiff does acknowledge that land purchases were subject to central approval, and that Plaintiff and Schuler Homes (i.e., the parent in Hawaii), used the same Internet website domain name. Furthermore, Plaintiff in its brief acknowledges that Schuler Homes provided all financing, but argues that loans to the subsidiary do not make a business enterprise unitary. "It is not the investment that makes a business enterprise unitary. It is the underlying economic realities of the way the business functions."
Plaintiffs argument regarding "economic realities" comes from the Supreme Court's decision in ASARCO Inc. v. Idaho StateTax Comm'n, 458 US 307, 102 S Ct 3103, 73 L Ed 2d 787 (1982) (ASARCO), which dealt with a state's attempt to apportion income from capital gains, dividends, and interest income from ownership of securities issued by five foreign subsidiaries in which the parent held either minority or bare majority interests. The court recognizes that "the proper inquiry looks to `the underlying unity or diversity of business enterprise,' not to whether the nondomiciliary parent derives some economic benefit — as it virtually always will — from its ownership of stock in another corporation."Woolworth, 458 US at 363-64 (citing Mobil Oil Corp.v. Comm'r of Taxes of *Page 174 Vermont, 445 US 425, 440, 100 S Ct 1223, 1233,63 L Ed 2d 510 (1980)). However, in ASARCO "the partial subsidiaries were not realistically subject to even minimal control by ASARCO, and were therefore passive investments in the most basic sense of the term." Container Corp.,463 US at 176 n 15. By contrast, Plaintiff and the other divisions/subsidiaries within the Schuler Homes Group were subject to considerable control by the parent and were, contrary to Plaintiffs assertion, far more than mere passive investments. The flow of capital resources and services between Schuler Homes and its various divisions/subsidiaries, including Plaintiff, clearly demonstrates a functionally integrated company. That conclusion, coupled with the court's findings of centralized management and economies of scale, renders Plaintiff a unitary group engaged in business activities constituting a single trade or business. As such, it is subject to the allocation and apportionment provisions of the relevant statutes.
E. Due Process
As a final matter, Plaintiff has questioned whether federal due process considerations permit Oregon to include out-of-state income in Plaintiffs apportionable tax base. However, aside from raising the issue, Plaintiff failed to address the matter.
10, 11. The Supreme Court has stated that Fourteenth Amendment due process imposes two requirements on state taxation of interstate commerce: there must be "a `minimal connection' or `nexus' between the interstate activities and the taxing State, and `a rational relationship between the income attributed to the State and the intrastate values of the enterprise.'"Exxon Corp. v. Wisconsin Dept. of Rev., 447 US 207,219-20, 100 S Ct 2109, 65 L Ed 2d 66 (1980) (Exxon) (citations omitted). That requirement was reiterated in Container Corp., 463 US at 165-66. The court explained that "[a]t the very least, this set of principles imposes the obvious and largely self-executing limitation that a State not tax a purported `unitary business' unless at least some part of it is conducted in the State."Id. at 166.
Schuler Homes operated a single trade or business — homebuilding. It did so in six states, including Oregon. It clearly availed itself of the privilege of doing business in *Page 175 
Oregon and, thus, there is sufficient connection between the interstate activities and the taxing state. See Exxon,447 US at 220. As to the second requirement, Plaintiff must prove "that the income apportioned to [Oregon] under the statute is `out of all appropriate proportion to the business transacted [by the Schuler Homes Group] in [Oregon].'" ContainerCorp., 463 US at 180-81 (citation omitted). Plaintiff has presented no evidence on that question. Under ORS 305.427, Plaintiff has the burden of proof, and must establish its case by a preponderance of the evidence. Moreover, the Supreme Court has stated that the assertion of disproportionate attribution must be proved "by `clear and cogent evidence.'" ContainerCorp., 463 US at 170. In this case, there is simply no evidence on that point.
12-14. An additional requirement under the Due Process and Commerce Clauses is that the apportionment formula be "fair."See id. at 169. The court explained the fairness requirement as follows:
 "The first, and again obvious, component of fairness in an apportionment formula is what might be called internal consistency — that is the formula must be such that, if applied by every jurisdiction, it would result in no more than all of the unitary business' income being taxed. The second and more difficult requirement is what might be called external consistency — the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated."
Id.
 15. Plaintiff has not demonstrated that more than all of the unitary income from the Schuler Homes Group would be taxed if Oregon's three-factor apportionment formula (which is modeled after the Uniform Distribution of Income for Tax Purposes Act (UDITPA), and measures business activity by considering sales, payroll, and property) were adopted in every jurisdiction. The second fairness requirement is that the formula must be fair in its application. The objective here is to prevent extraterritorial taxation by requiring that the resulting tax corresponds to the taxpayer's in-state presence. That requirement is more or less analogous to the rational *Page 176 
relationship requirement addressed above. The typical challenge under this prong of the fairness requirement is that, under separate accounting, considerably less income was actually earned in the state than is being reached under the state's formula. Again, Plaintiff presented no evidence on that question and the Oregon Supreme Court has previously found that application of the apportionment formula resulting in more than an 800 percent increase in tax liability was not unconstitutional. SeePennzoil Co. v. Dept. of Rev., 332 Or 542, 550-51, 33 P3d 314
(2001). Similarly, the Supreme Court sustained apportionment over taxpayer's Fourteenth Amendment challenge in UnderwoodT'writer Co. v. Chamberlain, 254 US 113, 120-21, 41 S Ct 45,65 L Ed 165 (1920), in spite of the fact that while only three percent of the net profits were received in the taxing state, Connecticut's formula assigned 47 percent of the taxpayer's net income to that state.
 III. CONCLUSION
The court concludes that Plaintiff and the other divisions of the Schuler Homes Group operated as a unitary group engaged in a single trade or business, as demonstrated by centralized management and a common executive force, centralized administrative services and functions resulting in economies of scale, and a flow of capital resources and services demonstrating functional integration. Accordingly, its business income[8] shall be apportioned to this state pursuant to ORS314.615 (requiring allocation and apportionment of net income) and ORS 314.650 through 314.665 (providing for apportionment of business income and defining the property, payroll, and sales factors). Now, therefore,
IT IS THE DECISION OF THIS COURT that Plaintiffs request that the court reverse Defendant's assessments for tax years 1997 through 2000, inclusive, and order Defendant to accept Plaintiffs returns as filed, based on separate accounting, is denied. Plaintiff was involved in a unitary business with the other members of the Schuler Homes *Page 177 
Group and is subject to the state's apportionment formula; and
IT IS FURTHER DECIDED that Plaintiff has failed to demonstrate that apportionment of its income violates due process.
[1] In February 2002, Schuler Homes merged with D.R. Horton, Inc., with D.R. Horton, Inc., being the surviving entity. Schuler currently serves as a regional president of D.R. Horton, Inc.
[2] According to Schuler's testimony, Rielly Homes was interested in expanding into Arizona, but the stipulated facts state that Rielly Homes was "a homebuilder in Southern California and Arizona for the prior 13 years."
[3] For example,
 "[m]anagement personnel of the Melody entities remained in their same positions after the 
acquisition * * * and continued with the Melody entities throughout all of the years at issue. * * * Brien Stafford, president of Stafford Homes, and the management team of Stafford continued in their positions throughout all of the tax years at issue. * * * Sean Keys and the management team of Keys Homes were employed as the management team for Schuler Homes Oregon and Schuler Homes Washington. * * * [And,] Thomas J. Rielly and the management team of Rielly Homes, Inc., stayed in their same positions * * *"
[4] A memorandum from Schuler to the division presidents and controllers, dated April 12, 2000, addresses the approval process. The memo states, in part:
 "This is a follow-up to the discussion held at the recent division presidents meeting.
 "In 1999, all of our divisions purchased a total of over $1.2 million of furniture, fixtures, equipment and computer software. The purchasing of capital items must be approved by the Division President and the Corporate Office. Once a capital expenditure has been approved at your division, please submit a copy of the request to Doug Tonokawa. The request should include a description and cost of the purchase, reason for the purchase, and comparison to the capital additions budget per the business plan. Doug will also circulate the request to Pam and me for approval. If it is a computer related purchase, Bill Colleary and/or Galen Lee will also review the request."
(Emphasis added.)
The memorandum does not specifically state that the corporate approval process is a new policy. An alternative reading of the memorandum is that it is simply reiterating an existing policy.
[5] All references to the Oregon Revised Statutes (ORS) and the Oregon Administrative Rules (OAR) are to 1997.
[6] Due to the pending appeal of the Nabisco case, the court feels constrained from addressing that decision in its analysis of this case.
[7] The court assumes the designation "CAO" stands for either Chief Administrative Officer or Compliance and Audit Officer.
[8] As far as the court knows, there is no "nonbusiness income" at issue in this case. Allocation is, therefore, not at issue. *Page 178