No. 63       January 19, 2012       567

IN THE OREGON TAX COURT
MAGISTRATE DIVISION

ORACLE CORPORATION,
Oracle Systems Corporation and Subsidiaries,
*Plaintiffs,*

*v.*

DEPARTMENT OF REVENUE,
*Defendant.*

(TC-MD 070762C)

Plaintiffs appealed from Defendant's assessments of corporation excise tax regarding gain from sales of stock in its subsidiary corporations, arguing that the gains should be excluded in computing its Oregon taxable income on the grounds that the gains had no connection with Oracle's business activities in Oregon and the gains were therefore not includable in its business income subject to apportionment for purposes of Oregon's corporate excise tax liability. Defendant argued that the sales factor denominator does not include proceeds from sales outside the regular course of business, and Plaintiff's stock sales were not transactions or activities in the regular course of Plaintiff's business. Following trial, the court found that gains from the sale of Oracle Japan stock were business income, and that those gains were to be included in the sales factor denominator under ORS 314.665 for purposes of determining the correct amount of the tax under the state's weighted three factor apportionment formula. The court further found that it did not have the authority to exclude those gains from the denominator under ORS 314.670.

Trial in the matter was held on September 14 through 16, 2010, in the courtroom of the Oregon Tax Court, Salem.

John H. Gadon, Lane Powell PC, Portland, argued the cause for Plaintiffs (taxpayer).

Marilyn J. Harbur, Senior Assistant Attorney General, Department of Justice, Salem, argued the cause for Defendant (the department).

Decision for Plaintiffs rendered January 19, 2012.

**DAN ROBINSON, Magistrate.**

Plaintiffs appeal from Defendant's July 3, 2007, assessments of corporation excise tax to "Oracle Corporation & Subsidiaries" for tax years ended (TYE) May 31, 1999, May 31, 2000, and May 31, 2001. There are essentially three entities involved in the appeal: (1) Oracle Corporation,

Oracle Systems Corporation and Subsidiaries (Oracle)[1]; (2) Oracle Corporation Japan (Oracle Japan); and (3) Liberate Technologies, Inc. (Liberate). The primary issues in the case concern the treatment of Plaintiffs' gains from the sale of stock in two entities: Oracle Japan and Liberate.

Trial in the matter was held in the courtroom of the Oregon Tax Court on September 14, 15, and 16, 2010. Plaintiffs were represented by John H. Gadon, Attorney at Law, and Charles F. Hudson, Attorney at Law, Lane Powell. Defendant was represented by Marilyn J. Harbur, Senior Assistant Attorney General, and Darren Weirnick, Assistant Attorney General, Oregon Department of Justice.

Testifying for Plaintiffs was Jon Iverson (Iverson), Senior Director of Tax for Oracle Corporation (Oracle), who has been with the company for 10 years and is in charge of all of Oracle's state taxes, including income, property, sales, and the business license taxes. Just prior to going to work for Oracle, Iverson worked in the state and local tax departments of several of the "big four" public accounting firms. Iverson, a certified public accountant in Colorado, has several undergraduate degrees including a Bachelor of Science degree in accounting from Brigham Young University, and a Master of Science in Taxation degree from Golden Gate University.

Also testifying for Plaintiffs was Sherry Warburton (Warburton), who began working for Oracle in 1989. Warburton is unquestionably a computer expert, with years of experience in the design and development of various forms of computer software and hardware, and electronic information delivery systems. Warburton worked for Oracle, then Liberate, and then Seachange, International (Seachange), when Seachange acquired a portion of Liberate in 2005. At the time of trial, Warburton was the Vice President of the Chief Technology Office for Seachange. Seachange primarily builds software for the delivery of video in the broadcast television (TV) industry. Seachange provides software for the broadcast of TV, video on demand, and set-top boxes.

---

[1] The subsidiaries of Oracle include (or included) Oracle Japan Holding, Inc. (OJH) and Oracle International Investment Corp. (OIIC). Both of those entities held stock and Oracle Japan prior to 1999.

Warburton's position is to provide strategy for Seachange. Warburton was, among other things, Vice President of Engineering at Liberate, and helped with the transition of her team at Liberate into Seachange.

Testifying for Defendant was Shirley Yee, a 30-year employee of the Department of Revenue with multiple degrees, who spent the last 15 years as a Senior Corporate Tax Auditor for the Department of Revenue.

For ease of reference, the parties (Plaintiffs and Defendant) will be referred to as Oracle and the Department.

## I.   STATEMENT OF FACTS

A.  *Introduction and Overview*

By their pleadings, the parties agree to the following salient facts, with minor stylistic changes and restatements made by the court.

1.  *Oracle*

Oracle is a corporation organized and existing under the laws of the State of Delaware, with a California commercial domicile. Oracle develops database and application business software for computers. According to information contained in Oracle's Form 10-K form for TYE May 31, 2000, filed with the Securities and Exchange Commission (SEC) shortly thereafter, Oracle defines itself as follows:

"[Oracle] is the world's leading supplier of software for information management. The Company develops, manufactures, markets and distributes computer software that helps corporations manage and grow their businesses.

"* * * * *

"*Oracle's product development platform is based on an Internet computing* architecture. The Internet computing architecture is comprised of data servers, application servers and client computers or devices running a web browser. * * *

"The Company believes that electronic commerce (the exchange of goods and/or services electronically over the Internet) is revolutionizing businesses by providing a relatively low-cost means of distributing products and

expanding markets globally, increasing efficiencies, and providing better, more personalized customer services. ***

"The Company *continually enhances its existing products and develops new products* to meet its customers' changing requirements as well as to expand its product base. ***

"The Oracle relational database management system ('DBMS') , the key component of Oracle's Internet platform, enables storing, manipulating and retrieving relational, object-relational, multi-dimensional, and other types of data. Oracle Version *8i is a database specifically designed as a foundation for Internet development and deployment*, extending Oracle's technology in the areas of data management, transaction processing and the data warehousing to the new medium of the Internet. ***

"Oracle *Lite Version 8i is the Company's mobile database* for Internet computing. The Oracle Lite database management system can be *used to run applications on portable devices* and to temporarily store data on these devices which can be replicated back to Oracle. Oracle Lite is *a complete and comprehensive platform* for building, deploying and managing mobile applications that principally run on laptops and information appliances such as hand-held devices, cell phones, smart phones, pagers, smart cards and *television set top boxes*.

"* * * * *

"Oracle offers Internet Application Server (IAS) Wireless Edition formerly Portal-to-Go, which enables information and services to be accessed through wireless and other devices. These devices include *** modem equipped personal organizers and *television set-top boxes*. Using IAS Wireless Edition, mobile operators, content providers, and wireless Internet service providers can quickly implement wireless portals *** *for providing personalized services and content* through wireless devices."

Iverson testified that database software runs "behind the scenes," and is used by computer specialists commonly known as information technology personnel. Such software is typically not used by end-users. Application software is business-related programs used by everyday computer users as well as experts (both of which are referred to

as "end users"), and includes spreadsheets, accounting software, etc.

Iverson testified that, for the years at issue, Oracle was in four lines of business: (1) the sale of software; (2) the installation of software; (3) software support (at home and abroad); and (4) Oracle University (where individuals go to receive training and certification).

According to Iverson, Oracle's Oregon activities included sales, consultants involved in the installation of software, and on-site university training in this state. There was no direct support activity by Oracle employees in Oregon.

2.  *Oracle Japan*

Oracle Japan is a Japanese corporation. Prior to 1999, two of Oracle's subsidiaries, Oracle Japan Holding, Inc. (OJH), and Oracle International Investment Corporation (OIIC), held stock in Oracle Japan.

Oracle Japan sold software (mostly Oracle software) to the Japanese market through various licenses with Oracle. According to the testimony, Oracle Japan had to modify Oracle's software so that it would be "localized," and thus usable by purchasers in that country. Iverson testified that Oracle Japan had a large group of developers and software engineers who took that software and made it work for the local market. To do that, they did two things: First, they "localized" it, which, according to Iverson, converted everything into the Japanese language and made sure that the reports that came out of the software were compatible with the Japanese business community, including conformance to Japanese Securities and Exchange Commission (SEC) reporting requirements; second, what Oracle Japan did, which none of the other companies within the Oracle group around the world did, was a significant amount of additional testing to ensure that the systems and software used were compatible with the rest of Oracle's software. Because of that additional necessary testing, Oracle software introduced to the Japanese market usually lagged six to eight months behind the introduction of similar software in other markets around the world.

Iverson testified that, in addition to Oracle's United States-based support centers, Oracle also has support centers in Australia, India, Romania, and Ireland. Those support centers are located where they are because they are all in different time zones, and, according to Iverson, all of the support centers are "interconnected." As a result, customers from all of Oracle's affiliates around the world, except Oracle Japan, had 24-hour support provided by technicians in any of the five countries, depending on the time of day (or night). However, Oracle Japan had its own support mechanism. Iverson testified that Oracle Japan "put its own personnel around the world in its own support centers."

Oracle began selling software to Oracle Japan in the 1980s. In the early 1990s, Oracle began experiencing financial difficulties, and acquired funding from an unrelated corporation (Nippon Steel) in exchange for a share of Oracle. That transaction gave rise to the creation of Oracle Japan Holding, Inc. Oracle Japan Holding, Inc. held stock in Oracle Japan. Oracle Japan "went public" in 1999 and became a publicly traded Japanese business. Iverson testified that Oracle Japan Holding, Inc., sold 10 percent of its Oracle Japan Stock in the year 2000 or 1999, and used at least some of that money (approximately $6.4 billion) as a loan to Delphi, a separate business owned by Oracle. Iverson further testified that Delphi invests "excess cash," and that they gave Oracle the $6.4 billion, which Oracle, in turn, used to purchase more of its own publicly traded stock. Iverson testified that the decision to sell Oracle Japan stock in 1999 and 2000 was "made in California." Furthermore, according to Iverson, the activity related to the sale took place in Japan because the stock was traded on the Tokyo Stock exchange. There was no Oregon activity related to that sale. Accordingly, on its Oregon return, Oracle did not include the gain from the sale of Oracle Japan.

3. *Liberate*

Liberate, originally known as Network Computer, Inc. (NCI), was formed by Oracle in December 1995 and began as a division of Oracle. Iverson testified that Oracle started a hardware company that, through a process of formations, incorporations, acquisitions and mergers, and

name changes, gave birth to Liberate. Liberate was incorporated in April 1996 as NCI, a wholly-owned subsidiary of Oracle.

In August 1997, Oracle acquired Navio Communications, Inc. (Navio), a subsidiary of Netscape Communications. Navio was merged into NCI, with NCI emerging as the surviving entity. After the merger, Oracle owned approximately two-thirds of Liberate's stock.[2] In May 1999, NCI changed its name to Liberate Technologies.[3]

Liberate was in the business of developing and licensing software that provided two-way interactive network communications with consumer appliances, primarily television set-top boxes. NCI was a developer of software and appliances for use by consumers to access the Internet. During TYE May 31, 2000, and May 31, 2001, Liberate was not a member of Oracle's "affiliated group" for purposes of Internal Revenue Code (IRC) sections 1501 to 1505 (1986).

Liberate "went public" in late July 1999 through an initial public offering (IPO) of Liberate stock. Oracle's stock ownership in Liberate was substantially reduced after Liberate's IPO in 1999. In early April 1999, Oracle still owned over 70 percent of Liberate. Later that month, an issuance of Liberate preferred stock reduced Oracle's ownership to 59.2 percent. At the time of the Liberate IPO in July 1999, Oracle still owned more than 50 percent of Liberate's stock. According to the uncontroverted testimony and documentary evidence, Oracle's interest reduced to 47.4 percent on or about February 2, 2000, to 40.9 percent on or about February 24, 2000, to 34.5 percent on or about July 31, 2000, and to 32 percent on July 31, 2001.

For TYE May 31, 1999, May 31, 2000, and May 31, 2001, Oracle's income was determined under the Oregon Uniform Division of Income for Tax Purposes Act (UDITPA), codified in ORS 314.605 to 314.675. Oracle filed consolidated

---

[2] Netscape Communications personnel apparently received 35 percent of the NCI stock as part of the merger.

[3] It is unclear whether NCI actually became Liberate through a name change, as Plaintiff asserts, or by way of merger, as Defendant contends. However, the court need not resolve that question in order to decide this case.

federal income tax returns for three tax years, TYE May 31, 1999, through May 31, 2001. Oracle timely filed consolidated Oregon corporate excise tax returns for those same years, and paid the tax shown as due therein.

The Department issued notices of assessment for the years at issue: $17,734 for TYE May 31, 1999; $5,061,872 for TYE May 31, 2000; and $93,590 for TYE May 31, 2001 (approximately $5.17 million). The Department also assessed interest in the amounts of $10,541.84, $2,553,420.83, and $38,127.73, respectively, for those three years (approximately $2.6 million).

B.   *Sale of Oracle Japan Stock*

During TYE May 31, 1999, and May 31, 2000, Oracle[4] sold shares of Oracle Japan common stock. Those sales occurred on or about February 1999 and April 2000. Oracle's gains from those sales were $24 million and $6.4 billion, respectively. Oracle reported capital gains from these sales on its federal consolidated corporate income tax returns. Oracle excluded the gains from those sales in computing its *Oregon* taxable income on its Oregon corporate excise tax returns, on the grounds that the gain had no connection with Oracle's business activity in Oregon.

C.   S*ale of Liberate Stock*

During TYE May 31, 2000, and May 31, 2001, Oracle sold shares of Liberate common stock and recognized capital gains on those sales for federal income tax purposes. Those sales took place in February 2000, when Oracle sold approximately 4,000,000 shares of stock for a gain of $441,363,085, and October 2000, when Oracle sold shares for a gain of $31,208,148.[5] Oracle excluded those

---

[4] The stock that was sold was owned and sold by Oracle Japan Holding, Inc., a wholly-owned subsidiary of Oracle Systems Corp. ("Oracle"). For purposes of this decision, all of the sale transactions are referred to as Oracle sales.

[5] Although the evidence is not entirely clear regarding the date of the sale in TYE May 31, 2001, the court finds the Department's conclusion that the sale took place in October 2000 a reasonable inference from the evidence cited by the Department in its Post-Trial Memo on page 17. The Department notes that the larger sale of Liberate stock in February 2000 (seven months after the IPO) was approved by the Delphi board that same month, and that the Delphi board subsequently approved the second, smaller, sale of Liberate stock in October 2000. Given that the first of the two sales occurred in the same month the board

gains in computing its Oregon taxable income. The rationale for excluding the gains on the sales on its Oregon corporate excise tax returns was that the sales were unrelated and unconnected to Oracle's Oregon business activities, and the gains were not part of the business of Oracle's unitary group doing business in Oregon. In July 1999, Liberate undertook an IPO and became a public company.

## II.  ISSUES

A.  *Are Oracle's gains from the sales of stock in Oracle Japan in February 1999 (TYE May 31, 1999) and April 2000 (TYE May 31, 2000) excluded from the sales factor denominator under ORS 314.665 and the corresponding Oregon Administrative Rules (OAR)?*

B.  *If those gains are not excludable under the statute and regulations, does the court have the authority to exclude the gain on the sale of the Oracle Japan stock from the denominator of Oracle's sales factor under ORS 314.670?*

C.  *Are Oracle's gains from the sales of stock in Liberate in February 2000 (TYE May 31, 2000) and October 2000 (TYE May 31, 2001) includable in Oracle's business income under ORS 314.610?*

D.  *If the gains from sales of Liberate stock are business income under ORS 314.610, is Oregon barred from taxing those gains under the federal due process and commerce clauses?*

E.  *If the gains from the sales of Liberate stock are taxable by Oregon under the statute, and if Oregon is not constitutionally prohibited from taxing those gains, are the gains from the sales excludable from the sales factor denominator under ORS 314.665 and the corresponding OAR?*

F.  *Did the Department err in its treatment of Oracle's gains from the sales of stock in two other entities - Apogee and Virata?*[6]

---

approved of the action, it is reasonable to assume that the second sale of Liberate stock occurred shortly after the board approved of that action.

[6] Virata is a business connected with Oracle or a subsidiary, but is not mentioned in Plaintiffs' Complaint. The court briefly addresses this issue later in this Decision.

## III.　ANALYSIS

A.　*Statutory Overview*

For the years at issue, Oregon used a weighted three factor formula for apportioning business income under UDITPA. ORS 314.650(1).[7] Under that formula, business income apportionable to Oregon is multiplied by a fraction, the numerator of which is comprised of a property factor and a payroll factor "plus two times the sales factor." *Id*. The sales factor, in turn, "is a fraction, the *numerator* of which is the total sales of the taxpayer *in this state* during the tax period, and the *denominator* of which is the *total sales* of the taxpayer *everywhere* during the tax period." ORS 314.665(1) (emphasis added).

ORS 314.610(7) defines "sales" as "*all gross receipts* of the taxpayer not allocated under ORS 314.615 to 314.645[,]" unless the context requires otherwise. (Emphasis added.) In defining "sales" for purposes of determining the sales factor in Oregon's apportionment formula, ORS 314.665(6) specifically provides that sales "[e]xcludes gross receipts arising from the sale * * * of intangible assets, including but not limited to securities, unless those receipts are derived from the taxpayer's primary business activity." ORS 314.665(6)(a). However, the statute further provides that sales "[i]ncludes net gain from the sale * * * of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income." ORS 314.665(6)(b).

B.　*Gains from the sale of Oracle Japan Stock*

1.　*Pertinent Facts*

During the years at issue, Oracle held shares of Oracle Japan stock through two of its wholly owned subsidiaries, Oracle Japan Holding, Inc. (OJH), and Oracle International Investment Corporation (OIIC). Those subsidiaries held the stock prior to 1999. Oracle, by and through its subsidiaries (OJH and OIIC), sold shares of Oracle

---

[7] The court's references to the Oregon Revised Statutes (ORS) are to the 1999 edition, unless noted otherwise.

Japan common stock during TYE ending May 31, 1999, and May 31, 2000, and received substantial gains from those sales ($24 million for TYE May 31, 1999, and $6.4 billion for TYE May 31, 2000).

Oracle reported the gains from the sales of Oracle Japan stock on its federal consolidated corporate income tax returns, but excluded the gains in computing its Oregon taxable income on the grounds that the gains had no connection with Oracle's business activities in Oregon and the gains were therefore not includable in its business income subject to apportionment for purposes of Oregon's corporate excise tax liability. The Department adjusted Oracle's Oregon returns for those years to include Oracle's gains from the sale of Oracle Japan stock in Oracle's business income.

In their Complaint to this court, Plaintiffs argued that "Defendant erred by including in Plaintiff's business income subject to apportionment * * * Plaintiff's gain on the sales of Oracle Japan stock." This court issued Opinions in *Crystal Communications, Inc. v. Dept. of Rev.*, 20 OTR 111, WL 2827462 (July 19, 2010) (*Crystal Comm's*); and *CenturyTel, Inc. v. Dept. of Rev.*, 20 OTR 169, WL 3122632 (Aug 9, 2010), ruling in favor of the Department on the question of whether certain gains recognized by the taxpayer in each of those cases was business or nonbusiness income (concluding that a correct interpretation and application of the functional test for business income under ORS 314.610 rendered the gain from sale of certain intangible assets[8] by taxpayers not domiciled in Oregon business income). After those Opinions were issued, Plaintiffs notified the court by letter dated September 7, 2010, that, for purposes of this case, "Oracle is therefore electing, with respect to the gains on the sale of Oracle Japan stock, to no longer litigate *in the magistrate division* the question of whether the gain on the sale of Oracle Japan stock is includible in Oracle's business income under ORS 314.610(1) for Oregon corporate excise tax purposes." (Emphasis added.)

---

[8] Proceeds from the sale of an FCC license in *Crystal Comm's* and the sale of stock in *CenturyTel*.

2.  *Issue*

Accordingly, with respect to the proper treatment of Oracle's gain from the sale of stock of Oracle Japan in TYE May 31, 1999, and May 31, 2000, the parties have narrowly framed the issue as whether such gain is includable in the denominator of the sales factor under Oregon's apportionment formula described above.[9]

3.  *ORS 314.665 and OAR 150-314.665(1)-(A)(5)*

The Department contends "it is uncontested that [Oracle's] sales of stock in [Oracle Japan] *** were not transactions or activities in the regular course of [Oracle's] business" and that it "included the gain from the sale of stock in [Oracle] Japan *** in business income only under the functional test for business income." Furthermore, the Department "excluded the proceeds from the sales [of Oracle Japan stock] from the sales factor denominator under OAR 150-314.665(1)-(A)(5)" because "[t]he sales factor denominator does not include proceeds from sales outside the regular course of business[.]"

OAR 150-314.665(1)-(A)(5) provides: "[t]he denominator of the sales factor will include the total gross receipts derived by the taxpayer from transactions and activity in the regular course of its trade or business."[10]

The Department expanded slightly on that argument later in its Post-Trial Memorandum by stating that its auditor included the disputed gain in Oracle's business income under the functional test based on a "conclu[sion] that the Oracle Group's ownership of [Oracle] Japan was 'an integral part of Oracle's business[,]'" but that, according to the auditor's testimony, "the Oracle Group's sales of [Oracle] Japan stock did not occur in the regular course of the Oracle Group's business of selling software."

---

[9]  The Department clarifies in a footnote that "[i]f the proceeds are not entirely excluded from the sales factor, the department does not argue that the proceeds are included in the numerator of the sales factor."

[10]  The audit period covers TYE May 31, 1999 through May 31, 2001 (calendar years June 1, 1998, through May 31, 2001). All of the court's references to the OARs are to the January 2004 edition. As near as the court can tell, that is the year the parties relied upon in their memorandums, and the 2004 rules were in effect during the time period in which the years at issue were open to audit.

If the court correctly understands the Department's position, the Department appears to be arguing that, although Oracle *owned* Oracle Japan, that *asset* was an integral part of its business, but the *sale* of its Oracle Japan *stock* was not part of Oracle's regular business, which was the sale of software. In fact, in arguing for the exclusion of the gain from the denominator under ORS 314.665 and the corresponding administrative rule (OAR 150-314.665(1)-(A)(5)), the Department plainly states that "[t]here is no evidence in this proceeding that the Oracle Group regularly sold substantial stakes in its unitary subsidiaries." (Emphasis in original.)

Oracle responds as follows. First, Oracle insists that it is undisputed that: (1) the Oracle Japan stock was an intangible asset; (2) Oracle's gains on the sales of its Oracle Japan stock "w[ere] not derived from Oracle's primary business activity[;]" and (3) "[t]he gain on the sales of the stock was included in Oracle's business income."[11] Oracle proceeds to argue that the gains on the sales of Oracle Japan stock clearly constitute "sales" under ORS 314.610(7) because the gains were gross receipts not otherwise allocated under ORS 314.615 to 314.645. Furthermore, Oracle argues that the gains "resulted from sales of intangible assets (stocks) not derived from Oracle's primary business activity but included [by the Department] in Oracle's business income." Accordingly, under ORS 314.665(6)(b), Oracle insists that the gains must be included in Oracle's sales factor denominator.

For the years at issue, ORS 314.665(6)(b) provided in relevant part that, in calculating the sales factor, sales "[i]ncludes net gain from the sale *** of intangible assets not derived from the primary business activity of the taxpayer but included in the taxpayer's business income."

To the extent that the gain is excluded from the sales factor under the statute (ORS 314.665(6)), but included under the corresponding administrative rule (OAR 150-314.665(1)-(A)(5)), the rule is invalid because an agency

---

[11] As indicated earlier in this court's Decision, Oracle did not and has not actually "conceded" that the gain should be includable in Oracle's business income, only that "Oracle chose not to contest the Department's characterization of the gain as business income in the Magistrate Division."

cannot adopt a rule that conflicts with a statute. *Garrison v. Dept. of Rev.*, 345 Or 544, 548-549, 200 P3d 128 (ruling that an "agency rule that conflicts with a statute is invalid to the extent that it so conflicts and that a rule created within a statutory scheme cannot amend, alter, enlarge upon, or limit statutory wording so that it has the effect of undermining the legislative intent") (citing *Miller v. Employment Division*, 290 Or 285, 289, 620 P3d 1377 (1980).

Oracle then refutes the Department's assertion that the gains should be excluded from the denominator by noting that the Department included the gains in business income under the "functional test" and, under that test, the income "must arise from property the acquisition, use and disposition of which constitutes 'an integral part of the *taxpayer's regular trade or business operations*.'" (Emphasis in original.) Oracle argues that the Department cannot, on the one hand, make a determination that Oracle's acquisition, use, and disposition of the Oracle Japan stock "was an integral part of Oracle's *regular trade or business* for purposes of ORS 314.610(1)," and then "turn around and claim that it is not for purposes of OAR 150-314.665(1)(A)." (Emphasis in original.) The court agrees. The test for the determination of whether gains constitute business income under the functional test (and therefore become subject to tax under the state's weighted three factor formula) is whether the activities giving rise to the gain were "integral parts" of the taxpayer's "*regular* trade or business operations." However, the statutory requirement for inclusion of the gain in the sales factor denominator (as part of the calculation of the percentage by which business income is taxed) is that the gain not be derived from the taxpayer's "*primary* business activity."[12] ORS 314.610(1) (defining business income); ORS 314.665(6)(b) (defining sales for purposes of the sales factor formula) (Emphasis added.)

---

[12] The statute (ORS 314.665(6)(b)), of course, does include the additional requirement that the gain be "included in the taxpayer's business income[,]" but the Department has clearly included the gain in Oracle's business income. Accordingly, the requirement that the gain be included in the taxpayer's business income was not included in the court's discussion of the specific language of the statutory definitions of business income and sales under the sales factor portion of the formula.

Another point is in order. This court recently rejected the argument the Department appears to be making in this case, which is that the gain can be included in business income under the functional test because ownership of Oracle Japan stock was an integral part of Oracle's business, but the sale of the Oracle Japan stock can be (and should be) excluded from the sales factor denominator because the sale did not occur in the regular course of Oracle's business of selling software. In *Crystal Comm's*, this court rejected the taxpayers' argument that under the functional test the gain on the disposition of an asset (there an FCC license) cannot be included in business income unless the "disposition [was] a regular part of the business of the taxpayer." *Crystal Comm's*, 20 OTR at 123. Remember, under the functional test, a test so named by Oregon courts based on the wording of Oregon's business income statute, business income "includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." ORS 314.610(1). It is generally recognized that there are four separate activities set forth in that test: (1) acquisition; (2) management; (3) use or rental; and (4) disposition. *See Crystal Comm's*, 20 OTR at 123, (citation omitted).

The court stated that, in applying the functional test, the parties' "arguments focus on how to read the language of ORS 314.610 * * * [and] especially the word 'and[,]'", which is the statutory connector for the four activities delineated in the so-called functional test (acquisition, management, use or rental, and disposition). *Crystal* Comm's, 20 OTR at 123. In framing the question, the court noted that "[p]articularly in the case of gain from a disposition of property, must the taxpayer be in a business that regularly disposes of the type of property in question, or is it sufficient that the property was an integral part of the trade or business at the time of its disposition?" *Id*. In rejecting the taxpayers' contention that the disposition of the asset must have been a regular part of its business, the court declared that "[t]axpayers' construction has the effect of rendering the functional test * * * completely redundant or duplicative of the 'transactional test.'" *Id*. In reaching its decision, the

court in *Crystal Comm's* cited the California case of *Hoechst Celanese Corp. v. Franchise Tax Bd.*, 25 Cal 4th 508, 106 Cal Rptr 2d 548, 22 P3d 324, *cert den* 534 US 1040, 122 S Ct 614, 151 LEd2d 537 (2001), which found the functional test to exist and apply to dispositions of property used in the business. *Crystal Comm's*, 20 OTR at 123. If you do not distinguish between the use and disposition of an asset in determining whether a given gain is business income under the functional test, which requires that those activities (and others) "constitute integral parts of the taxpayer's regular trade or business operations," per ORS 314.610, then the court sees no reason for distinguishing between the ownership and sale (or use and disposition) of an asset when determining business income and calculating the sales factor. That is what the Department did in including Oracle's gain from the sale of Oracle Japan stock in Oracle's business income based on Oracle's ownership of Oracle Japan, but excluding gains from the sale of Oracle Japan from Oracle's sales factor denominator because the Department determined that Oracle did not sell stock as part of its regular course of business. Rather, the disputed income is business income and is included in the sales factor denominator.

Finally, although it does not appear that there is any dispute between the parties, the court wants to be clear that the disputed gains are *not* included in the numerator of Oracle's sales factor per ORS 314.665(4) because the income-producing activity giving rise to the gain on the sales of Oracle Japan stock took place outside Oregon.

### 4. *ORS 314.670 Reapportionment*

The Department argues in the alternative that, if the court includes the gain from the sale of Oracle Japan stock from the sales factor denominator under ORS 314.665 (and other statutes), then the gain should nonetheless be excluded under ORS 314.670. Not surprisingly, Oracle strenuously disagrees, arguing that "ORS 314.670 applies *only to administrative actions* by the Department which must be taken prior to assessment." (Emphasis in original.)

ORS 314.670(1) provides in relevant part that "[i]f the application of the allocation and apportionment provisions of ORS 314.605 to 314.675 do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for and the Department of Revenue may permit, or the department may require, in respect to all or any part of the taxpayer's business activity [one of a number of alternative methods of allocating and apportioning the taxpayer's income]."

Again, the court finds Oracle has the better argument. In *Stonebridge Life Ins. Co. I v. Dept. of Rev.*, 18 OTR 423, 443 (2006), this court ruled that "neither ORS 314.670 nor ORS 314.280 grants power to a court to reapportion a taxpayer's income; they grant that power only to the department."

## C.  *Gains from the Sale of Liberate Stock*

There were two significant sales of Liberate stock during TYE May 31, 2000, and May 31, 2001. The first sale occurred in February 2000, and the second in October 2000. Oracle recognized gains of approximately $441 million and $31 million, respectively, from those transactions.

Oracle argues that the gains are not includable in its Oregon taxable income because, after Liberate's IPO, Oracle and Liberate were no longer unitary, and Oracle did not hold the Liberate stock as part of its unitary business. The Department contends that Oracle's gains from the sale of Liberate stock are includable in Oracle's business income because Oracle held the Liberate stock as an integrated part of its unitary business, and that the gain is business income under the "functional test" found in ORS 314.610(1).

The Department insists that Oracle "acquired and managed Liberate as part of [its] unitary business" and that the two "were engaged in a unitary business at least until an initial public offering ('IPO') of Liberate stock in late July 1999." Oracle responds that it is irrelevant that Oracle and Liberate were at some point in time unitary because "the purpose for which Oracle held Liberate stock changed well before the stock was sold."

A unitary business is "a corporation or group of corporations engaged in business activities that constitute a single trade or business." ORS 317.705(2). A '"[s]ingle trade or business' may include, but is not limited to, a business enterprise the activities of which[][a]re in the same general line of business (such as manufacturing, wholesaling or retailing)[.]" ORS 317.705(3)(b). Although subsection (3)(b) falls short of establishing a presumption that corporations engaged in the same line of business are unitary, the United States Supreme Court found such an administrative presumption would be "reasonable," stating that:

> "[w]hen a corporation invests in a subsidiary that engages in the same line of work as itself, it becomes much more likely that one function of the investment is to make better use—either through economies of scale or through operational integration or sharing of expertise—of the parent's existing business-related resources."

*Container Corp of Am. v. Franchise Tax Board*, 463 US 159, 178, 165, 103 SCt 2933, 77 L Ed2d 545 (1983).

The distinguishing element of a unitary business is "a sharing or exchange of value" between the member parts of the enterprise demonstrated by: "(A) [c]entralized management or a common executive force; (B) [c]entralized administrative services or functions resulting in economies of scale; and (C) [f]low of goods, capital resources or services demonstrating functional integration." ORS 317.705(3)(a).

Oracle contends that, after the IPO in July 1999, Liberate and Oracle were in completely different lines of business. The court finds that Oracle's contention constitutes a distinction without a difference. Oracle's business focus was corporate software, and Liberate's business focus was on personal consumer products that utilized Oracle's software. The focus of both businesses was on computer software technology, and Liberate's focus promised to generate significant revenues for Oracle.

There is no question that Oracle and Liberate were originally unitary. Liberate, originally known as NCI, began as a division within Oracle, and in April 1996, Liberate was incorporated as a wholly-owned subsidiary of Oracle. Oracle

formed Liberate and later merged Navio, another company Oracle acquired, into Liberate in the regular course of Oracle's unitary business. Those activities, and particularly the formation of Liberate, were key components of Oracle's growing business. Oracle's 1996 annual report states in part:

> "Oracle has conspicuously championed the Network Computer during 1996, and while we won't be a manufacturer, we stand to benefit greatly if it proves to be as successful as we expect. *Not only will we make software for these machines, but our database business will grow as tens of millions of new Network Computer users access the Information Highway \* \* \*."*

(Emphasis added.)

The acquisition of Navio in 1997 and Liberate's subsequent emphasis on set-top boxes and other interactive media was part of Oracle's strategic vision, which emphasized research and development in areas that complemented Oracle's software business. Oracle's Form 10-K for the fiscal year ending May 31, 1998, states, in part:

> "As part of its business strategy, [Oracle] completed the acquisition of Navio \* \* \* in fiscal 1998, and *expects to continue to make acquisitions of, or significant investments in, businesses that offer complementary products, services and technologies.*"

(Emphasis added.)

Liberate was one of those businesses that complemented and grew Oracle's business. Oracle further explains in Form 10-K that "[t]he Company has in recent years expanded its technology into a number of new business areas to foster long-term growth, including application servers, internet/electronic commerce, interactive media and network computing."

The court agrees with the Department that, after the merger with Navio, Liberate's operations remained unitary with the operations of Oracle, at least until the IPO in July 1999. At that time, Oracle still owned over 50 percent of Liberate's stock. Moreover, as the Department notes in its Post-Trial Memorandum, Liberate's Board of Directors

included the CEO and the CFO of Oracle, as well as David Roux, who, as the Department notes, "recently had served as both an Executive Vice President of Oracle * * * and CEO of Liberate."

The court also finds persuasive the Department's argument that additional indicia of the close unitary relationship between Oracle and Liberate "is reflected in the related party transactions described in Liberate's Form 10-K for TYE 2000, including, for example, Oracle's $10M guaranty of a lease of office space to Liberate * * * a three-year Technology License Agreement entered into during TYE 1998 between Oracle and Liberate by which Oracle marketed and distributed Liberate's products, a Services Agreement entered into during TYE 1998 pursuant to which Oracle provided professional services to Liberate customers, and a tax indemnity and allocation agreement, under which Oracle still owed Liberate $923,000 for the use of Liberate's tax losses."

Further evidence of the unitary relationship between the two entities is found in Oracle's Oregon corporate excise tax return for TYE May 31, 1999, in which Oracle reported that it was engaged in a unitary business with Liberate as of May 31, 1999. That return states, in pertinent part: "Since, Oracle Corporation's ownership percentage is over 50% and has unitary relationship with [Liberate], the entire fiscal 1999 taxable loss is being reported on the Oregon Corporation Excise Tax Return."

The existence and establishment of a unitary business relationship between two entities satisfies at least part of the constitutional requirement necessary for Oregon to apportion the business income under the UDITPA provisions of ORS 314.605 to ORS 314.675. Moreover, the term "trade or business" as part of the definition of "business income" in ORS 314.610(1) "means the unitary business of the taxpayer." OAR 150-314.610(1)-(A)(3)(e).

That brings the court to the question of whether the disputed gains constitute business income. Oregon courts recognize that the definition of business income found in ORS 314.610 includes a "transactional test" and a

"functional test." *Pennzoil Co. v. Dept. of Rev.*, 332 Or 542, 546, 33 P3d 314 (2001) *cert den* 535US 927,122 SCt 1297, 152 LEd2d 210 (2002) (citing *Willamette Industries, Inc. v. Dept. of Rev.* (*Willamette Industries*), 331 Or 311, 316, 15 P3d 18 (2000); *see also Simpson Timber Company v. Dept. of Rev.*, 326 Or 370, 374, 953 P2d 366 (1998)).

The Department insists the disputed gains constitute business income under the functional test. Under the functional test, business income "includes income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations." ORS 314.610(1); *see also Willamette Industries* at 315-31.[13]

For purposes of this case, the only real question is whether the disposition (*i.e.*, sale) of the stock constituted an integral part of Oracle's regular trade or business operations. Oracle argues that "[i]t is a fundamental principle of tax law that it is the character of the property and the purpose for which it was held *at the time it was sold* that controls." *Continental Can Co., Inc. v. United States*, 422 F2d 405, 410 (Ct Cl 1970) (emphasis in original). Oracle notes that "[t]he purpose for which property is held may change over time[,]" and that, "[i]n this case, the testimony is uncontroverted that the purpose for which Oracle held Liberate stock changed well before the stock was sold. Liberate had completely abandoned network computing and the business market to focus on interactive television and the consumer market months before the IPO." Oracle further argues that "[a]t the time of the IPO and thereafter, Liberate served no functional purpose for Oracle[,]" and that Oracle "retained

---

[13] *Willamette Industries* identified two tests for business income:

"ORS 314.610(1) defines business income as income derived from two sources. The first source is 'income arising from transactions and activity in the regular course of the taxpayer's trade or business.' We will refer to that portion of the definition as a 'transactional' test.

"The second source is 'income from tangible and intangible property if the acquisition, the management, use or rental, and the disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.' We will refer to that portion of the definition as a 'functional' test."

*Id.* at 316 (emphasis in original).

the stock [of Liberate] as an investment." Oracle notes that the retention of the stock as an investment "turned out to be a very prudent investment because after the IPO Liberate created a buzz in the marketplace and its stock price increased substantially."

The court finds Oracle's argument unpersuasive. Neither the facts nor the law support Oracle's position. Oracle was in the computer software business and routinely started, bought, and sold related hardware and software businesses. That was all part of Oracle's overall business strategy discussed above. Oracle owned or controlled a number of affiliates and subsidiaries in the same line of business, and annually bought and sold assets and investments for various purposes related to its comprehensive and visionary business model. Those entities included Oracle Japan Holding, Inc. and Oracle International Investment Corp., both of which were Oracle subsidiaries that at one time held stock in Oracle Japan. Oracle also owned Apogee Open Systems (Apogee), which originally operated as a separate entity out of Denver, Colorado. "Apogee was in the business of developing industry-specific software to improve the operational efficiencies of businesses in the energy industry." Oracle purchased all of Apogee's assets for cash in the mid-1990.

As to the legal argument, the applicable administrative rule provides in relevant part:

"Under the functional test, business income need not be derived from transactions or activities that are in the regular course of the taxpayer's own particular trade or business. It is sufficient, if the property from which the income is derived is or was an integral, functional, or operative component used in the taxpayer's trade or business operations, or otherwise materially contributed to the production of business income of the trade or business ∗∗∗."

OAR 150-314.610(1)-(A)(5)(a).

As to the particular timing question and Oracle's contention that the asset that generated the gains the Department seeks to tax (gain from the sale of Liberate stock) had been converted to an investment, the facts and applicable administrative rule defeat that claim.

The regulation provides in relevant part that "[p]roperty that has been converted to nonbusiness use through the passage of a sufficiently lengthy period of time (generally, five years is sufficient) or that has been removed as an operational asset and is instead held by the taxpayer's trade or business exclusively for investment purposes has lost its character as a business asset[.]" *Id*.

Factually, the evidence shows that in April 1999 Oracle owned approximately 70 percent of Liberate, and as of May 31, 1999, Oracle owned approximately 59 percent of Liberate. Thus, Oracle owned more than one-half of Liberate's stock just prior to the IPO in late July 1999. The two subsequent stock sales here at issue occurred shortly thereafter, in February and October 2000. As the Department notes in its Post-Trial Memorandum, "[s]elling an asset that has played an operational role in the taxpayer's business does not produce nonbusiness income merely because the taxpayer makes plans to sell the asset or because the asset takes some time to sell."

Additionally, as the Department points out in its Post-Trial Memorandum:

> "Notably, plaintiffs also classified the gain from the sale of Liberate in TYE 2000 and TYE 2001 as business income on their combined California corporation franchise tax return. Plaintiffs cannot reasonably distinguish the treatment of the gain on their California and Oregon returns. Both Oregon and California recognize a separate functional test, according to which gain from the sale of property is business income if the property was used in the taxpayer's business. *See Crystal*, 20 OTR 111 (2010), TC No. 4769 (July 19, 20[0]0); *Hoechst-Celanese Corp. v. Franchise Tax Bd.*, 25 Cal 4th 508, 22 P3d 324, *cert den* 534 US 1040, 122 S Ct 614, 151 L Ed3d 537 (2001). Both Oregon and California have adopted the applicable provisions of Multistate Tax Commission regulations pursuant to which gain from the sale of an asset that was part of the taxpayer's unitary business is business income. *Cf.* OAR 150-314.610(1)-(B)(2) *with* 18 CAL CODE REGS § 25120(c)(2)."

For the foregoing reasons, the court concludes that the gains from the sales of Liberate stock were business income.

The next question is whether Oregon is constitutionally barred from taxing those gains under the federal due process and commerce clauses. Having determined that Oracle and Liberate were unitary, Oregon may tax the gains, provided there is "a 'minimal connection' or 'nexus' between the interstate activities and the taxing State, and 'a rational relationship between the income attributed to the State and the intrastate values of the enterprise.'" *Exxon Corp. v. Wis. Dep't. of Rev.*, 447 US 207, 219-20, 100 SCt 2109, 65 LEd2d 66 (1980) (citations omitted); *see also* I. Jerome R. Hellerstein & Walter Hellerstein, *State Taxation*, ¶ 8.07[2] (3rd ed 1998) (noting that if the court finds that a unitary business relationship exists, then the state can constitutionally tax the earnings). The "nexus is sufficient if the corporation has availed itself of the 'substantial privilege of carrying on business' within the state." *Miami Corp. v. Dept. of Rev.*, TC-MD 021295C, WL 1083751 at *16 (Feb 17, 2005) (quoting *Mobil Oil Corp. v. Comm'r of Taxes of Vt.*, 445 US 425, 457, 100 SCt 1223, 63 LEd2d 510 (1980)). Oracle acknowledges that it was doing business in Oregon for the years at issue.

There is an additional requirement under the due process and commerce clauses that the apportionment be "fair." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 US 159, 169, 103 SCt 2933 (1983). To be fair, a state's apportionment formula must have "internal consistency," so that if the formula were "applied in every jurisdiction, it would result in no more than all of the unitary business'[es] income being taxed," and "external consistency" in that the factors used in the formula must actually reflect a reasonable sense of how income is generated. *Id.* Furthermore, "the formula must also be fair in its *application*" to the individual taxpayer. *Schuler Homes of Oregon, Inc. v. Dept. of Rev.*, 19 OTR-MD 152, 175 (2006). There is insufficient evidence in this case to demonstrate a lack of constitutional fairness.

The final question is whether the gains from the sales of Liberate stock should be included in the sales factor denominator under ORS 314.665 and the corresponding administrative rule. Here, the court finds that Oracle has the better argument and that the gains are included in the denominator for the same reasons the gains from the sale of

Oracle Japan have been found to be included in the denominator of the sales factor.

D.  *Gains from the Sale of Apogee and Virata*

According to the Complaint, Oracle purchased Apogee in the mid-1990s, and Apogee was a "division" of Oracle operating in Denver, Colorado. In February 2000, Oracle sold Apogee's assets, recognizing a capital gain that it reported on its federal income tax return, but not on its Oregon corporate excise tax return. Oracle claims that Apogee was a separate business that was not unitary with Oracle, and that the gain from the sale of the Apogee assets was unrelated and unconnected to Oracle's Oregon business activities, and that the gain constituted nonbusiness income allocable to a state other than Oregon. Oracle contends that the Department erred in including the gains in Oracle's business income subject to apportionment for TYE May 31, 2000. The Department, in its Answer, denied those allegations. The Department included the gain in Oracle's business income subject to apportionment for TYE May 31, 2000.

Oracle did not produce sufficient evidence of its claims at trial to show that the gains should not be taxed as the Department determined was appropriate, and the Department's inclusion of those gains in Oracle's business income is therefore upheld.

The final matter in this case has to do with gains from the sale of Virata. There is no mention of that entity in the Complaint. The court allowed Oracle to present testimony on the gain from the sale of Virata, over the Department's objection. The basis for the Department's objection was that Oracle never raised the issue in its lengthy and detailed Complaint. The court has reviewed the rather limited testimony and documentary evidence on the question of the tax treatment of the disputed gain by Oregon and concludes that there is insufficient evidence to overturn the Department's treatment of that income. Accordingly, the Department's determination that the gain was includable in Oracle's apportionable business income, and its treatment thereof, is hereby upheld.

IV.   CONCLUSION

For the reasons set forth above, the court concludes that the gains from the sale of Oracle Japan stock are business income, and that those gains must be included in the sales factor denominator under ORS 314.665 for purposes of determining the correct amount of the tax under the state's weighted three factor apportionment formula. The court further concludes that it does not have the authority to exclude those gains from the denominator under ORS 314.670.

The court further concludes that Oracle's gains from the sale of the Liberate stock are includable business income under ORS 314.610, that Oregon is not barred from taxing those gains under the federal due process and commerce clauses, and the gains are included in the sales factor denominator under ORS 314.665.

Finally, the court is upholding the Department's tax treatment of Oracle's gains related to sales of Apogee and Virata. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted in part, as set forth above.